UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

Angel Morales,

                    Petitioner,              CV-05-1104 (CPS)

          - against -                        MEMORANDUM
                                             OPINION AND ORDER
Joseph Smith,

                    Respondent.

-----------------------------------------X

SIFTON, Senior Judge.

On February 28, 2005, Angel Morales filed this petition for

habeas corpus pursuant to 28 U.S.C. § 2254 seeking review of his

conviction in New York Supreme Court for second degree burglary.

He is currently serving a sentence of sixteen years to life

imprisonment.  Morales states the following two claims for relief

from his conviction: (1) he was denied the right to present a

meaningful defense in violation of the Due Process Clause of the

Fourteenth Amendment because the trial judge excluded testimony

of his expert fingerprint witness; and (2) he was denied the

right to confront witnesses against him in violation of the

Confrontation Clause of the Sixth Amendment and the Due Process

Clause of the Fourteenth Amendment because the trial judge unduly

limited the scope of his cross-examination of the state's expert

witness.

For the reasons that follow, the petition is denied.

## Background

The following facts are drawn from the record of the state court proceedings. They are undisputed except where noted.

Morales was arrested on May 1, 1999, after the police received a report that a man was breaking into an apartment on Vernon Avenue in Brooklyn. Shortly after his arrest, Morales was taken to Brooklyn Jewish Hospital. On May 5, 1999, he attempted to escape from the hospital, but was apprehended again. Morales was subsequently charged with the Vernon Avenue burglary.

The police were in the same period of time investigating a burglary that had occurred on Tompkins Avenue in Brooklyn on April 1, 1999. Based on a computer assisted search of the state's fingerprint records, it was determined that a fingerprint recovered from the Tompkins Avenue burglary matched Morales' prints. He was thereafter charged with the Tompkins Avenue burglary.

At trial, the state called Officer Michael Curtis, who recovered the fingerprint from the Tompkins Avenue apartment. Curtis testified that he lifted the print from a champagne glass in the apartment. An occupant of the apartment testified that she saw the police dust the champagne glass and that she used the glass to store coins.[1] (Tr. 76, 82.) On cross-examination, Curtis testified that he did not take a picture of the glass prior to lifting the print. (Tr. 112.) The occupant of the apartment testified that she washed the glass after the police

---

[1] The coins had been removed from the glass, but not taken in the burglary, perhaps because they were Canadian. (Tr. 93.)

left.  (Tr. 83.)

The state called a fingerprint expert, Rosemarie Simonetti, to testify that the print lifted from the glass matched Morales'. (Tr. 140.)  Simonetti testified that she had received the print from Officer Curtis.  She testified that she placed the print into a computer fingerprint-matching program.  (Tr. 130.)  The computer provided a number of possible matches, including Morales' prints.  (Tr. 134-35.)  She then visually compared the Tompkins Avenue print to Morales' fingerprints and determined that they matched.  (Tr. 135-36.) During this testimony, the jury was shown projected pictures of the fingerprint found at the Tompkins Avenue apartment and Morales' fingerprint.  (Tr. 144.) After describing the similarities the two prints had, Simonetti testified that she was "a hundred percent" certain that the prints were identical.  (Tr. 147.)

On cross-examination, Simonetti testified that, although she had been trained in fingerprint comparison, she had only a vague understanding of how fingerprints are lifted.  (Tr. 152.)  During this cross-examination, Morales sought to elicit testimony that fingerprints can be "planted."[2]  In that connection, Morales

---

[2] On cross-examination by Morales' lawyer, the following exchange took place:

Q:    [I]s it true that fingerprints can be moved from one place to another?"

A:    Not to my knowledge.

Q:    Are you familiar with the Roth Report?

(continued...)

sought to cross-examine Simonetti concerning a document referred to by counsel as "the Roth Report."[3]

---

[2](...continued)
A:    No.

      KOHLER [ADA]:    Objection.

      SARTORI [Morales' lawyer]:    Judge, she is declared
                                     an expert.

      THE COURT:  She said she's not familiar with it.

Q:    Are you familiar with newspaper . . .

A:    Yes.

      KOHLER:    Objection.

      THE COURT:  Sustained.

Q:    Are you familiar with New York State troopers –

      KOHLER:    Objection.

Q:    . . . being arrested and indicted for removing fingerprints?

A:    Only from reading it in the paper.

      THE COURT:  Sustained.  Sustained.

A:    I'm sorry.

(Tr. 160-61.)

[3]The Roth Report, prepared by special prosecutor Nelson E. Roth, details the results of an investigation into a specific New York State Police troop's practices of tampering with evidence, including planting of fingerprints.

According to the Roth Report, New York State Police Troop C used a variety of methods of fabricating evidence, including:

(1) simply lying about the source of a legitimate latent print, claiming it came from one location generally incriminating to the suspect rather than its actual source; (2) using the same method as (1), but having the defendant touch an object while in plice custody so that his prints could be obtained to frame him; (3) lifting an nk impression from an inked fingerprint card, perhaps doctoring its appearance, and claiming that it was a latent lift taken from a crime scene; (4) making copies of ink impressions, using a variety of methods, and making lifts from the copies; (5) manipulating photograpic negatives to produce photographs of latents and/or ink impresssions and also depicting a background

(continued...)

On the defense case, Morales sought leave to call a fingerprint expert witness to testify (1) that fingerprints could in fact be moved from one place to another and (2) that a fingerprint can be smudged during the process of lifting it. (Tr. 367-68.)  The trial judge denied the application during the following colloquy:

> SARTORI: With respect to my two motions in limine that we discussed in chambers, first with respect to calling my expert witness, Judge, my initial application is that he should be allowed to testify with respect to fingerprint fabrication and the ability for there to be movement with respect to fingerprints from one location to another.
>
> The two witnesses that the People called with respect to fingerprint evidence testified to two specific statements that I believe to be inaccurate, if not untrue.  One, that a print could not be messed up or destroyed in the lifting process, and secondly, that fingerprints couldn't be moved from one location to another.  I would ask to have my expert be allowed to be called for those purposes and those purposes only and the People be limited in their questioning to those issues.
>
> THE COURT: That's denied.  I don't think there is any reasonable view of the evidence that fingerprint was moved.  You can ask the witness, does the fingerprint match the defendant's fingerprint.  The two experts can disagree on that point, but the movement from point A to point B seems irrelevant in the context of this case.  Therefore, I'm not going to permit that.

---

[3](...continued)
different than the actual source of the "print"; and (6) making "lifts" directly from the fingers of a dead homicide victim and doctoring their appearnc so as to be able to use them at a later time to "plant" as evidence against a subject . . .

Roth Report 5-6

Morales does not contend that any of the police officers or units discussed in the Roth Report were involved in the investigation of his case.

Then you had another point about the tape.

SARTORI: Note my exception.  Yes.

COURT: Your argument was you should be permitted to ask the witness, isn't it true that the tape will smudge a fingerprint.  That, again, seems an irrelevant issue. The question is, does the fingerprint match the defendant.  Was it smudged or unsmudged.  Your expert can say this is the wrong fingerprint.  It doesn't match.

SARTORI: It's our argument that these go to credibility and whether or not these witnesses are as credible as they would have the Court believe, one having been declared an expert.  I believe that the fact that those answers are not accurate goes to their credibility and would have to shed some light on the rest of their testimony as well.

THE COURT: I'm going to deny that.  I think that the trial should focus on the real issues and there are two real issues here.  Is it his fingerprint; yes or no.  Was he trying to  break in to steal or just trying to go in for some other purpose.  That's the legitimate issue

(Tr. 368-69.)

Morales thereafter took the stand in his own defense. Morales testified that when he was first arrested, he was suffering from heroin withdrawal.  The police took him to the hospital to be treated.  He testified that during his hospital stay, he was under police guard, but attempted to escape.  The only questioning concerning his presence in the Tompkins Avenue apartment where the fingerprint was found is the following exchange on cross-examination:

Q:  Do you know Maqeda Sanderson?

A:  No.

Q:  Have you ever seen her before she testified?

A:    Who is that?  The lady that was here?

Q:    The woman who testified.

A:    There's been a lot of people up here.

Q:    The apartment you broke into at 179 Tompkins.

A:    No, I didn't rob her apartment.

      SARTORI:   Objection.

      THE COURT: Sustained.

(Tr. 397.)

Morales was convicted of burglary in the second degree in violation of New York Penal Law § 140.25(2), criminal trespass in the second and third degrees in violation of New York Penal Law §§ 140.15 & 140.10(a), trespass in violation of New York Penal Law § 140.05, petit larceny in violation of New York Penal Law § 155.25, criminal mischief in the fourth degree in violation of New York Penal Law § 145.00(1), and escape in the second degree in violation of New York Penal Law § 205.10.  He was sentenced as a persistent felony offender to sixteen years to life imprisonment.

On appeal to the Appellate Division, Morales argued that the trial court's refusal to permit him to cross-examine Simonetti concerning her knowledge of the Roth Report and the exclusion of his proposed expert testimony was in violation of New York law and denied him the fair trial required by the Due Process Clause of the Fourteenth Amendment.  Morales also contended that the court had erroneously conducted a *Sandoval* hearing in his

absence.[4]  The appellate division's written opinion only analyzed
Morales's *Sandoval* claim.  With respect to the arguments he
pursues in this petition, the Appellate Division stated, "The
defendant's remaining contentions lack merit."

Morales sought leave to appeal this decision to the New York
Court of Appeals, but leave was denied on December 1, 2003.  His
conviction became final ninety days later on February 29, 2004,
when the time for petitioning the Supreme Court for a writ of
certiorari expired.  He filed this petition on February 28, 2005.
His petition challenges his conviction for burglarizing the
Tompkins Avenue apartment.

## Discussion

28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court
shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings unless
the adjudication of the claim --
> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of
> the evidence presented in the State court proceeding

"Clearly established Federal law" refers to the decisions of the
U.S. Supreme Court rendered prior to the time of the relevant
state-court decision.  *Williams v. Taylor*, 529 U.S. 361, 412

---

[4] A *Sandoval* hearing is a hearing through which a defendant may
obtain a prospective ruling as to the scope of his cross-examination
concerning prior criminal offenses and other misconduct, on the basis
of which he will decide to take the witness stand.  *See People v.
Sandoval*, 357 N.Y.S.2d 849 (N.Y. 1974).

(2000); *Green v. Travis*, 2005 WL 1581265, -- F.3d -- (2d Cir. 2005). A state prisoner may not be granted habeas relief based on an unreasonable or erroneous application of authority of a Federal Court of Appeals. *Yung v. Walker*, 341 F.3d 104, 110 (2d Cir. 2003).

"A state-court decision is 'contrary' to established federal law withing the meaning of § 2254(d)(1) if it is 'diametrically different' from, 'opposite in character or nature' to, or 'mutually opposed' to the relevant Supreme Court precedent. *Henry v. Poole*, 409 F.3d 48, 68 (2d Cir. 2005) (quoting *Williams*, 529 U.S. at 405). To be "contrary to" clearly established federal law, a state court's conclusion of law must be opposite to a conclusion reached by the Supreme Court or resolved differently on a materially indistinguishable set of facts. *Williams*, 529 U.S. at 413.

A state court's decision is an "unreasonable application" of a Supreme Court holding "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The issue is not whether all reasonable jurists would agree that there was error, but rather that there was "some increment of incorrectness beyond" mere error. *Howard v. Walker,* 406 F.3d 114, 122 (2d Cir. 2005) (quoting *Williams*, 529 U.S. at 411). "[T]he range of reasonable judgment can depend in part on the nature of the relevant rule." *Yarborough v. Alvarado*, 124 S.Ct. 2140 (2004).

The more general the rule in question, the more leeway the state court has in making case-by-case determinations. *Id.* at 2149.

State court factual findings are, in this context, presumed to be correct. 28 U.S.C. § 2254(e)(1). This presumption can only be rebutted by clear and convincing evidence. *Id.*

Where the trial court provides a reason for rejecting the claim, and the state appellate court summarily affirms, federal courts employ a rebuttable presumption that the state appellate court's "later unexplained orders upholding [the trial court's] judgment . . . rest upon the same ground" as the trial court's. *Serrano v. Fischer,* 2005 WL 1427298, -- F.3d -- (2d Cir. 2005) (quoting *Ylst v. Nunnemaker,* 501 U.S. 797, 803 (1991)).

The trial court did not explicitly identify the state evidentiary rule pursuant to which the questioning of Simonetti was curtailed or pursuant to which Morales's expert was excluded. It is, however, apparent from the transcript that the evidence was excluded because the danger of prejudice outweighed the evidence's slight probative value.

New York evidentiary law on this subject mirrors federal law. *See People v. Scarola*, 71 N.Y.2d 769 (N.Y. 1988). To be admissible, expert testimony must be relevant to the issues of fact of the individual case. *People v. Smith*, 784 N.Y.S.2d 923 (N.Y. Sup. Ct. 2004); *People v. Veloz*, 298 A.D.2d 213 (N.Y. App. Div. 2002). New York law permits a court to limit cross-examination to relevant matters. *People v. Straniero*, 17 A.D.3d 161, 162 (N.Y. App. Div. 2005); *People v. Ashner*, 190 A.D.2d 238,

246 (N.Y. App. Div. 1993). An expert may not be impeached using publications that she neither used in preparing her opinion nor considers authoritative *Lipschitz v. Stein*, 10 A.D.3d 634, 635 (N.Y. App. Div. 2004). The admission of such publications or testimony about their contents constitutes introduction of impermissible hearsay. *Id.* Here there was no indication that either experts in fingerprint identification relied on the Roth Report, that Simonetti had considered it, or that she considered it authoritative. Absent this foundation, questioning concerning the Report was of minimal probative value. As the state trial judge noted, there was no evidence that the fingerprint at issue in this case was lifted and planted. Introduction of Morales' expert's testimony about planting fingerprints or questioning concerning the Report created substantial risk of jury speculation that the prosecution's proof was similarly tainted. *Cf. People v. Davis*, 43 N.Y.2d 17 (N.Y. 1977) (evidence that statement by potential prosecution's witness, who was not called, was made under duress was properly excluded because it would suggest that testimony that was presented was also obtained under duress).

Morales contends that the expert's testimony was relevant on the issue of the Investigating Officer Michael Curtis' credibility, particularly after the officer testified that the fingerprint found at the scene of the crime was not photographed before it was collected and the glass on which it was found was

not preserved in evidence.[5]  But there was no evidence that the failure to photograph or preserve the champagne glass was a deviation from standard police practice.  Even considering the testimony relevant on this issue, its probative value outweighed its prejudicial potential

Although the state court's evidentiary rulings were within the bounds of a trial court's discretion as a matter of state (and federal) evidentiary law, the question on habeas review is whether the rulings were contrary to the United States Constitution.  Accordingly, I consider whether the ruling was contrary to clearly established federal law, and whether it was an unreasonable application of that law.

Morales contends that the trial court's exclusion of expert testimony concerning the ability to plant fingerprint and the limitation on his ability to cross-examine Simonetti concerning the Roth Report were in violation of clearly established federal law.  Although he does not state precisely what Supreme Court authority he relies upon, he cites several cases for the proposition that a defendant has the right to present a meaningful defense and to cross-examine witnesses against him, including *Washington v. Texas*, 388 U.S. 14 (1967), *Chambers v. Mississippi*, 410 U.S. 284 (1973), *Pointer v. Texas*, 380 U.S. 400 (1965), and *Crane v. Kentucky,* 476 U.S. 683 (1986).

---

[5] Morales does not argue that the failure to preserve the glass denied him due process.  Nor was such an argument presented to the state courts.

The state court's decision at issue here is not contrary to
any of the cases cited by Morales since each is readily
distinguishable.  *Pointer* involved the introduction of
transcripts of testimony at a pretrial hearing at which the
defendant was not represented by counsel.  Morales was
represented by counsel, and no transcripts of testimony were
introduced.  *Washington* and *Chambers* concerned the introduction
of evidence and testimony of confessions, bearing substantial
indicia of reliability, by others who claimed to have committed
the crime in question.  No confessions or testimony of witnesses
with personal knowledge are at issue in this case.  Nor did
Morales's trial involve the introduction of his own confession or
the circumstances surrounding the interrogation that produced it,
unlike *Crane v. Kentucky*, 476 U.S. 683 (1986).  In short, none of
the cited cases concern the exclusion of testimony because the
defendant failed to lay a foundation for its admission or because
the trial judge concluded that it was substantially more
prejudicial than probative.  The state court's decision was,
accordingly, not "contrary to" *Chambers, Crane, Pointer*, or
*Washington*.  Nor, did the state court unreasonably apply the
holdings of those cases.

The federal law identified by Morales, which is common to
the holdings in *Crane*, *Chambers*, *Pointer*, and *Washington,* is that
a court may not arbitrarily and irrationally apply evidentiary
rules in a mechanical fashion to exclude material, reliable,
exculpatory evidence.  This holding states, however, the sort of

general rule, the meaning of which emerges through application over time. Evidentiary rulings of the type made by the state court judge here by their nature require a balancing of competing interests. Reconciling evidentiary rulings and the Constitution in specific cases calls for "a substantial element of judgment." *Yarborough*, 124 S.Ct. at 2149. The substantial degree of judgment required by the decisions that Morales challenges means that AEDPA provides a state court with a greater degree of leeway than it would otherwise enjoy when applying more specific legal rules. *See Serrano v. Fischer*, 2005 WL 1427298, -- F.3d --, (2d Cir. 2005) ("In such circumstances, where the governing rule remains so roughly defined, we are less likely to conclude that a given interpretation or application of Supreme Court law is 'contrary to' or an 'unreasonable application of' Supreme Court precedent . . . ").

In this case, the trial court foreclosed additional questioning of Simonetti about the Roth Report after she testified that she was unfamiliar with its contents. The witness had testified that she lacked knowledge of the report. There was no evidence that she relied on the Roth Report in forming her opinions or considered it an authoritative source. An expert cannot testify concerning a matter to which she has no knowledge. Because she lacked knowledge about the Report, the trial court's preclusion of additional "repetitive or only marginally relevant" questioning that lacked foundation was not an unreasonable

application of Supreme Court precedent.[6]

<u>Exclusion of Expert Testimony</u>

The trial judge refused to allow Morales to call an expert witness on lifting and planting fingerprints in the absence of any foundation that the fingerprint in question had been planted. Morales contends that this evidence was relevant to impeach the credibility of Simonetti, who had testified that to her knowledge fingerprints could not be moved, and to prove that Morales' fingerprint had, in fact, been lifted and planted.

Morales claim fails because he cannot establish that the state court mechanically or arbitrarily excluded reliable evidence. First, contrary to Morales' assertion the evidence was not admissible to impeach Simonetti. On direct examination, Simonetti testified that the fingerprint in question matched

---

[6] At oral argument, Morales' counsel relied on the Second Circuit's recent opinion in *Howard v. Walker*, 406 F.3d 114 (2d Cir. 2005). Howard was convicted of murder in the second degree when the occupant of a house he and two accomplices were burglarizing died. After their arrest, Howard's accomplices told police that Howard grabbed the elderly victim and placed her in a chair and would not give her medicine that she requested. She thereafter had a heart attack and died. *Id.* at 117. The trial court excluded the co-defendants' confessions from their joint trial pursuant to *Bruton v. United States*, 391 U.S. 123 (1968) (holding that admission of co-defendant's confession in joint trial violates the Confrontation Clause because of defendant's inability to cross-examine co-defendant). The trial court did, however, permit an expert witness called by the prosecution to rely on these statements in forming his opinion as to the cause of death. The trial court then ruled that if Howard cross-examined the expert concerning the basis for his opinion, he would "open the door" to the admission of his co-defendants' confessions. The Second Circuit ruled that this required Howard to make the constitutionally impermissible choice between his right to cross-examine the opposing witness or his right to exclude the unreliable hearsay of a co-conspirator. *Id.* at 129. Morales was not presented with such a constitutionally impermissible choice.

Morales'.  It was only on cross-examination that Morales elicited from her the statement that, to her knowledge, fingerprints could not be moved.  It is well established that extrinsic evidence is not admissible to impeach a witness on collateral matters.  *See* FED. R. CIV. PRO. 608(b); *United States v. Antonakeas*, 255 F.3d 714, 724 (9th Cir. 2001).  The Supreme Court has not interpreted the Confrontation Clause "to encompass the right to impeach an adverse witness by putting on a third-party witness." *Harrington v. Jackson*, 1 Fed.Appx. 367 (6th Cir. 2001).

The Supreme Court has similarly recognized that a state has a legitimate interest in preventing mini-trials on collateral issues.  *United States v. Scheffer*, 523 U.S. 303, 314 (1998). The Constitution provides states with "broad latitude . . . to establish rules excluding evidence from criminal trial . . . so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer*, 523 U.S. at 308.  Precluding testimony concerning the ability to move fingerprints merely to impeach Simonetti's credibility falls well within Constitutional bounds.  *See United States v. Walker*, 930 F.2d 789, 791-92 (10th Cir. 1991) (no constitutional violation where trial court prevented defendant from calling witness merely to impeach another witness's testimony); *Klemp v. Renico*, 04-CV-71862, 2005 WL 1076249, at *14-15 (E.D. Mich. Apr. 19, 2005) (no constitutional violation where trial court prevented defendant from impeaching witness on a collateral matter).

Morales next contends, that the expert's testimony should

have been admitted because it was relevant to whether the fingerprint at issue was planted. The trial court excluded the testimony on the grounds that Morales failed to lay a foundation that the fingerprint in question had been lifted and planted. The trial court determined that expert testimony that such a process was possible was only relevant had Morales offered some evidence it had in fact occurred.[7]

Contrary to Morales' claim, the cases he cites to do not stand for the proposition that a defendant's due process rights are violated any time a state court excludes evidence that the defendant believes is relevant to his defense. Instead, they merely prohibit arbitrary rules that mechanically exclude evidence. *See Alley v. Bell,* 307 F.3d 380, 395 (6th Cir. 2002); Janet C. Hoeffel, *The Sixth Amendment's Lost Clause,* 2002 WIS. L. REV. 1275, 1289 (2002) ("[I]f the evidentiary rule has a rational basis –- namely a concern for trustworthy or reliable evidence –- then the Constitution goes no further"). Requiring a defendant to lay a foundation for the admission of evidence is not the sort of mechanical exclusion of evidence prohibited by *Chambers* or

---

[7] Morales' defense theory that his fingerprints that were on file were planted on the champagne glass is not particularly persuasive. According to the Roth Report, there was no need for the police to plant a fingerprint on the champagne glass because they could have just as easily taken one of Morales's prints from their file and provided it to Simonetti, without the need for planting it on a glass that was not, in any event, preserved as evidence. *See* ROTH REPORT 5-6. Presentation of this more plausible theory would not have required an expert on planting fingerprints because it does not assume that any print was actually planted. *See, e.g.*, ROTH REPORT 66, 71, 80, 90, 102-06, 108-10 (discussing various cases involving fabrication of latent fingerprints from ink fingerprints on file).

*Washington*.  *See Chambers*, 410 U.S. at 302 (observing that
defendant "must comply with established rules of procedure and
evidence designed to assure both fairness and reliability").
Indeed, the right to introduce evidence in defending against a
criminal charge is subject to reasonable restrictions.  *United
States v. Scheffer,* 523 U.S. 303, 308 (1998); *Taylor v. Illinois*,
484 U.S. 400, 410 (1988).  Those restrictions do not violate the
Constitution so long as they are not arbitrary or
disproportionate to the purpose they are designed to serve.
*Scheffer,* 523 U.S. at 308.

It was not an unreasonable application of Supreme Court
precedent to conclude that the application of the evidentiary
rule in this case was not disproportionate, arbitrary, or
mechanical.  The trial court imposed no blanket, per se exclusion
of evidence.  Instead it considered the proffered evidence
individually to determine if an adequate foundation had been
laid.  Nor was it arbitrarily applied in an asymmetrical fashion;
it limited both the prosecution and defense alike.  *Cf.
Washington*, 388 U.S. at 24 (Harlan, J., concurring) (noting that
the evidentiary rule at issue in that case would not have barred
the prosecution from presenting the same testimony).  Finally,
requiring that a foundation be laid prior to the admission of
evidence is not disproportionate to the confusion and speculation
that could potentially result.  Instead, the court merely
required Morales to establish that the evidence was relevant by
laying a sufficient factual predicate for its admission.  Such a

foundation might have been laid by evidence that Simonetti had
been presented with a fabricated fingerprint card, that the
police did not follow standard procedures in lifting the print,
that the glass from which the print had been lifted had been
wiped clean prior to the police discovering a print on it, or
testimony of an expert witness that aspects of this print
suggested that it had been planted.  Requiring such a foundation
cannot be said to be an unreasonable application of *Pointer,*
*Crane, Chambers,* or *Washington.  Cf. Tafoya v. Tansy,* 9 Fed.Appx.
862 (10th Cir. 2001) (unpublished) (counsel not ineffective for
failing to call expert witness on planting fingerprints, absent
any evidence that the defendant's fingerprints were planted*)*;
*Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002)
(same).[8]  The trial court could reasonably conclude that the

---

[8] Morales relies in on the pre-AEDPA decision *Ronson v.*
*Commissioner of Correction of the State of New York,* 604 F.2d 176 (2d
Cir. 1979).  In *Ronson,* the defendant sought to present expert
psychiatric testimony relevant to an insanity defense.  *Id.* at 177.
He did not, however, comply with a state procedural rule requiring
that notice be given to the prosecution when an insanity defense will
be presented so that the state may have the defendant examined by its
own doctors.  Accordingly, the testimony was excluded, and Ronson was
convicted.  *Id.* at 177-78.  The Second Circuit, applying the pre-AEDPA
standard of review, held that the failure to grant a continuance so
that the state could examine the defendant and the expert testimony
presented violated Ronson's Sixth Amendment rights.  The Second
Circuit explicitly noted that the excluded testimony was "relevant and
material."  The state's interest in receiving notice of the defense
could have been adequately accommodated and the indisputably relevant
evidence admitted had a continuance been granted.  The testimony that
Morales sought to introduce was only *conditionally* relevant.  The
legitimate state interest in limiting trials to the presentation of
relevant evidence could not have been accommodated by a continuance,
or anything short of a foundation for the evidence Morales sought to
introduce.  Finally, *Ronson* applied the pre-AEDPA *de novo* standard of
review.  The Court did not ask whether the state court's application

(continued...)

opposite ruling would have invited the jury to speculate concerning the existence of evidence that the fingerprint in this case was, in fact, tampered with.

Certificate of Appealability

Federal Rule of Appellate Procedure 22(b)(1) requires a habeas petitioner to obtain a certificate of appealability ("COA") before taking an appeal from the denial of his petition. To be entitled to a COA, a petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Such a substantial showing is made where jurists of reason would find it debatable whether the petition states a denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The COA, if issued, must indicate which specific issue satisfies the statutory standard. 28 U.S.C. § 2253(c)(2). Although I have concluded that the exclusion of

---

(...continued)
of clearly established federal law was unreasonable.

　　Morales also cites a post-AEDPA decision, *Noble v. Kelly*, 89 F. Supp. 2d 443 (S.D.N.Y. 2000), aff'd 264 F.3d 93. Noble was charged with a shooting outside of a bar. At trial, he sought to introduce the testimony of one of the bar's patrons to the effect that Noble was inside the bar with him playing a video game. *Id.* at 448. The trial court excluded this testimony because Noble had not provided notice of his intent to rely on an alibi defense as required by state law. *Id.* at 449. The federal district court found this to be an unreasonable application of the Supreme Court decision *Taylor v. Illinois,* 484 U.S. 400 (1988), which pertains to the exclusion of exculpatory evidence as a discovery sanction. *Id.* at 454. The evidence in *Noble* was directly relevant to the defendant's guilt or innocence. The case at bar, involves evidence that was only conditionally relevant upon the showing of an adequate foundation. No evidence was excluded as a discovery sanction. The holding of *Noble* has subsequently limited by *Wade v. Herbert*, 391 F.3d 135 (2d Cir. 2004) (declining to grant habeas relief where state court declined to permit evidence of an alibi defense because of defendant's late notice).

Morales' expert witness is not an unreasonable application of Supreme Court precedent, the conclusion is sufficiently debatable to justify the issuance of a COA with respect to the issue whether the exclusion of Morales' expert witness and the limitations placed on his cross-examination of Simonetti were unreasonable applications of federal law.

Conclusion

For the foregoing reasons, the petition for habeas corpus is denied and a certificate of appealability is granted.

The Clerk is directed to furnish a filed copy of the within to all parties and to enter judgment denying the petition.

SO ORDERED.

Dated : Brooklyn, New York

September 29, 2005

By: /s/ Charles P. Sifton (electronically signed)
United States District Judge